UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

           Plaintiff,           No. 13-12478

vs.           Hon. Gerald E. Rosen

MICHAEL J. FURNARI,
BEVERLY FURNARI,
TARA FURNARI, and
STEVEN CANTWELL,

           Defendants.
_____/

OPINION AND ORDER REGARDING DEFENDANTS'
MOTION TO DISMISS/AND FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on January 10, 2014

PRESENT: Honorable Gerald E. Rosen
United States District Chief Judge

## I. INTRODUCTION

This is a civil action brought by the United States Government pursuant to the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.*, to set aside as a fraudulent transfer Michael and Beverly Furnari's conveyance of real property situated in Kihei, Hawaii to their daughter, Tara Furnari. The matter is presently before the Court on the Defendants' Motion to Dismiss Count I and for Summary Judgment on Count II of

1

the Government's Complaint. The Government thereafter filed a Motion for Leave to Amend its Complaint, and subsequently, filed a response to Defendants' Motion to which the Defendants have replied.

Having reviewed and considered the parties' motions and briefs, and the entire record of this matter, as well as the public records of related criminal cases,[1] the Court has concluded that oral argument is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), this matter will be decided "on the briefs."

## II. FACTUAL BACKGROUND

**A. The Criminal Charges Against Furnari Arising from His Involvement in Scott Ashley's Mortgage Loan Transactions**

On September 9, 2008, Michael Furnari was charged in an Information with one count of Misprision of a Felony for concealing from authorities his knowledge of the scheme of another individual, Scott Ashley, to defraud Wells Fargo Bank and Huntington National Bank in 2002, in connection with Ashley obtaining mortgage loans from the banks in the amounts of $2,999,435.00 and $500,000.00, respectively. The loans were to be used by Ashley for the purchase of a residence located at 130 Brady Lane in Bloomfield Hills, Michigan valued at $5.5 million which was offered for sale by

---

[1] "A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice." *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir.2003); *Levy v. Macy's Inc.*, 2013 WL 5728673 at *1 (S.D. Ohio Oct. 22, 2013) ("[t]he Court can take judicial notice of matters of public record, including court records available through the PACER system via the internet." (citation omitted.)).

Furnari. *See United States v. Furnari*, E.D. Mich. No. 08-CR-20466.[2] The scheme to defraud included false and material misrepresentations to the banks that Ashley had made a down payment of $1,372,000.00 to Furnari when both Furnari and Ashley knew that Furnari received no such substantial down payment.

Despite knowing that Ashley had committed fraud against the mortgage-lending financial institutions by misrepresenting that he had made a down payment of more than one million dollars, Furnari failed to notify the authorities of Ashley's fraudulent actions. Furnari further took an affirmative step toward concealing the fraud by signing, at the closing of the mortgage loans -- which was attended by both Furnari and his wife, Beverly, and Ashley and his wife, Diane Campbell -- a statement falsely stating that he and his wife had received an even larger down payment of $2,096,424.00 from Ashley when he knew full well that they had been paid no such down payment; in fact, the down payment they received from Ashley was only $5,000.00.

After taking ownership of the property, Ashley made only three payments on the $500,000.00 mortgage loan from Huntington bank and did not make any payments on the $2,999,435.00 Wells Fargo loan. The banks subsequently foreclosed on the mortgages and the house was sold at auction at a substantial loss to the banks. Wells Fargo reported a net loss of $980,200.00 and Huntington Bank reported a loss of $387,130.00.

---

[2] Scott Ashley was separately charged in an eight-count Superseding Indictment for bank fraud and wire fraud based on the fraudulent scheme concerning Wells Fargo Bank, Huntington Bank and Brady Lane property, and other offenses. *See United States v. Ashley*, E.D. Mich. No. 05-CR-81039.

Furnari subsequently admitted in a deposition taken in a separate civil case filed in Oakland County Circuit Court, *Furnari v. Wells Fargo Bank*, Cir. Ct. No. 03-051024-CH, that he had entered into an agreement with Ashley to acknowledge receipt of the substantial down payment to assist Ashley in obtaining the mortgage loans to purchase the Brady Lane property. *See* Defendant's Memorandum of Law Regarding Restitution in *United States v. Furnari*, No. 08-CR-20466, Dkt. #8.

### B. The Investigation of the Brady Lane Property Transaction and Scott Ashley's Indictment

Thereafter, a federal investigation into Ashley's activities ensued. During this investigation, in 2005, Furnari was interviewed by federal agents and questioned about the sale of the Brady Lane property, his involvement with Ashley, and the Wells Fargo/Huntington Bank loan transactions. He was subsequently subpoenaed to testify before a federal grand jury.

On November 17, 2005, Ashley was indicted by the grand jury on various charges of bank fraud and wire fraud based on the fraudulent scheme concerning and the Brady Lane property. *See United States v. Ashley*, E.D. Mich. No. 05-CR-81039.[3] The charges lodged against Ashley in a Superseding Indictment were explicitly based, in part, on his purchase of Furnari's Brady Lane property and the 2002 mortgage loan transactions with Wells Fargo and Huntington Banks, *see id.,* Superseding Indictment, Dkt. # 13, ¶¶ 9-19;

---

[3] Ashley subsequently pled guilty to seven of the eight counts contained in his Superseding Indictment and was sentenced to 56 months imprisonment. *See* E.D. Mich. No. 05-81039, Dkt. # 42. He was also ordered to pay restitution. *Id.*

4

23-28. The Superseding Indictment further specifically alleged that, in various loan applications, Ashley provided Wells Fargo, Huntington Bank and other lenders, false information and fraudulent documentation that he had paid the seller of the Brady Lane residence [i.e., Furnari] a down-payment of $1,372,000. *See id*., ¶¶ 5C; 11C; 17C. Though Furnari was not identified in the indictment by name, the indictment specifically referred to the "seller of the residence" on Brady Lane, *see id*., ¶ 17C, and charged Ashley with "knowingly execut[ing] and attempt[ing] to execute a scheme to defraud, and to obtain by means of false and fraudulent pretenses and representations" monies from Wells Fargo Bank and Huntington Bank. *Id*. at ¶¶ 24, 26, 28.

Ashley ultimately pled guilty on November 15, 2006 -- after a jury had been impaneled for his trial -- to all of the charges of bank fraud (and four charges of social security fraud based on his use of fraudulent social security numbers on various loan applications). On May 16, 2007 Ashley was sentenced to 56 months imprisonment, and ordered to pay restitution in the amount of $1,664,580.00.

At his sentencing hearing, Ashley asserted that Michael Furnari had lied to the Grand Jury about his relationship with Ashley, and urged the Government to investigate Furnari's role in deceiving the banks and the crimes for which he (Ashley) was being sentenced. *See United States v. Ashley*, No. 05-81039, 5/16/07 Sentencing Hearing Tr., pp. 32-38.

Ashley thereafter appealed. On August 8, 2008, the Sixth Circuit affirmed this

Court's imposition of the sentence imposed.

Thereafter, on September 8, 2008, Furnari was charged in an information with one count of Misprision of a Felony based on his concealment and failure to inform authorities about Ashley's fraudulent scheme. He pled guilty and on July 12, 2010, he was sentenced to one-day (time-served) incarceration, one year of supervised release, and ordered to pay (jointly and severally with Scott Ashley) $1,367,330.00 restitution to cover the respective losses of Wells Fargo and Huntington Banks.[4] As of October 16, 2013, restitution of $1,361,807.30 remained unpaid and due and owing from Furnari, the last payment of $216.25 having been made more than a year ago on December 12, 2012.

## C. Furnari's Transfer of His Property in Hawaii

Meanwhile, prior to the federal charges being brought against Furnari but after he was questioned by federal investigators concerning the Brady Lane loan transactions, and shortly after Scott Ashley was convicted and sentenced, on September 6, 2007, Furnari and his wife transferred real property they owned in Kihei, Hawaii to their daughter, Tara, for $10.00. According to Maui County property tax records, in 2007 the total assessed value of the property was $1,587,400.00.[5]

---

[4] Furnari's Sentencing Hearing was originally scheduled for January 8, 2009 but was rescheduled *nine* times pursuant to the requests of Furnari and/or the Government.

[5] Furnari testified in a creditor's examination of him taken by the Government on October 17, 2012, that he and his wife acquired the Hawaii property in the 1980s and estimated that the property was worth about $700,000 or $800,000 at the time of transfer to Tara Furnari, with a mortgage indebtedness of a couple of hundred thousand dollars against it. Furnari 10/17/12 Dep., pp. 96-97.

According to Furnari, he and his wife decided that they should "gift" the property to Tara because "we were turning sixty and she [my wife] wanted to gift these properties." Furnari 10/17/12 Dep., p. 97. He testified that he does not retain use of the Hawaii property, and claimed he "d[id] not have all the details" as to whether Tara uses the property herself or uses it as income property, and stated only when asked whether she rented it out or time-shared it that she "possibly" did so. *Id.* at 100.

Although Furnari testified that he and his wife decided to divest their ownership of the Hawaii property because they "were turning sixty," from information obtained by the Government through title searches, it appears that the conveyance of the property to Tara was not the first time Furnari and his wife transferred ownership of this property to other family members.

In August 1995, Furnari and his wife conveyed the Hawaii property to two of their other daughters, Rainna and Mindy. The property was held in Rainna and Mindy's names for approximately six years, until December 21, 2001when the property was re-conveyed back to Furnari and his wife. It was then held by them again until the transfer to Tara Furnari on September 6, 2007.

Tara subsequently reconveyed the property to herself and her husband, Steven Cantwell, as husband and wife, on February 1, 2011. They have since encumbered the property with another mortgage to secure a loan of $438,500.00.

Furnari also testified on October 17, 2012 that (a) he was engaged in the

7

residential construction business since prior to 2000, operating through various LLCs, some of which had ceased doing business; (b) to continue his business, he had formed or had been a member of additional LLCs after 2000 but before 2006; (c) he had transferred his interest in certain of the LLCs to his son, Michael, and his daughter, Caroline; (d) he had personally guaranteed the debts of some of the LLCs that had discontinued doing business or were winding down by 2009-2010; (e) sometime prior to the October 17, 2012 deposition, he had ceased making payments on business debts to Fifth Third Bank, Independence Bank and Citizens Bank that he had personally guaranteed (in addition to the restitution owed to Wells Fargo and Huntington Bank) that totaled in excess of $4 million; (f) he had gone through difficult times financially from, and after, 2006; and (g) he had seriously contemplated filing for bankruptcy in 2006 or 2007, and, in fact, had engaged a law firm specializing in bankruptcy to assist him.

Meanwhile, restitution of $1,361,807.30 remains unpaid and due and owing from Furnari. To recover the restitution owed Wells Fargo and Huntington Bank, on June 6, 2013, the Government filed the instant Complaint for Avoidance of Fraudulent Transfer, to set aside the Furnaris' transfer of the Hawaii property to Tara Furnari in September 2007 as fraudulent and void, and seeking judgment against subsequent transferees of the property, to the extent necessary to satisfy the debt of Michael Furnari to the United States.

Defendants now move for dismissal and/or for entry of summary judgment in their

favor on both counts of the Government's Complaint. As indicated, before responding to the Defendants' motion, the Government filed a motion for leave to file an Amended Complaint. Its response to Defendants' motion, and Defendants' reply brief, both address Defendants' claims, as amended. Inasmuch as the Federal Rules of Civil Procedure dictate that leave to amend "should be freely granted when justice so requires", Fed. R. Civ. P. 15(A)(2), and because the parties have addressed Defendants' dismissal arguments in the context of the amended claims, the Court will GRANT the Government's motion for leave to amend, accept as if filed, the proposed Amended Complaint attached to the Government's motion, and proceed to address Defendants' dismissal arguments.

### III. DISCUSSION

### A. APPLICABLE STANDARDS

Fed. R. Civ. P. 12(b)(6) authorizes the Court to dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted. . . ." In deciding a motion brought under Rule 12(b)(6), the Court must construe the complaint in the light most favorable to the plaintiff and accept all well-pled factual allegations as true. *League of United Latin American Citizens v. Bredesen,* 500 F.3d 523, 527 (6th Cir. 2007). Yet, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). Moreover, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007) (internal quotation marks, alteration, and citations omitted). Rather, to withstand a motion to dismiss, the complaint's factual allegations, accepted as true, "must be enough to raise a right to relief above the speculative level," and "state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 555, 570, 127 S. Ct. at 1965, 1974. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678, 129 S. Ct. at 1949. The plausibility standard, however, "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant' liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

Summary judgment, on the other hand, is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.

Ct. 2548, 2552 (1986).

As with a Rule 12(b)(6) motion, in deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

The Court will apply the foregoing standards in deciding Defendants' motion to dismiss and for summary judgment in this case.

**B.  FRAUDULENT TRANSFERS UNDER § 3304(b)(1)(A) and § 3304(b)(1)(B) OF THE FEDERAL DEBT COLLECTION PROCEDURES ACT**

The Government brings this action pursuant to the Federal Debt Collection Procedures Act, 28 U.S.C. § 3301, *et seq*. (the "FDCPA"). Under § 3304(b)(1) of the FDCPA,

> [A] transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation --

> (A) with actual intent to hinder, delay, or defraud a creditor; or
> (B) without receiving a reasonably equivalent value in exchange for the transfer or obligation if the debtor --
>
>> (i) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

28 U.S.C. § 3304(b)(1).[6]

The thrust of § 3304(b)(1)(A) is the intent of the debtor to hinder, delay, or defraud the United States as a creditor, whereas the gravamen of § 3304(b)(1)(B) is the making of the transfer without receiving a reasonably equivalent value in exchange when the debtor incurred, or should have reasonably believed that he would incur, debts beyond his ability to pay them. *See United States v. Sherrill*, 626 F. Supp. 2d 1267, 1272 (M.D. Ga. 2000). In Count I of its Complaint, the Government alleges a claim under this latter section. Count II contains the Government's claim under § 3304(b)(1)(A).

### 1.    COUNT I OF THE GOVERNMENT'S COMPLAINT IS SUFFICIENTLY PLED

Defendants contend that Count I should be dismissed pursuant to Fed. R. Civ. P.

---

[6] The statute defines a "debtor" as "a person who is liable for a debt or against whom there is a claim for a debt." 28 U.S.C. § 3002(4). "Restitution" is included in the statute's definition of "debt." 28 U.S.C. § 3002(3).

12(b)(6) because it was not sufficiently pled. Specifically, Defendants maintain that the Government did not plead that Defendant Furnari "intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay." While it may have been true of the Government's original Complaint, this purported defect was cured in the First Amended Complaint. *See* First Amended Complaint, ¶ 32.

Defendants also argue, however, that notwithstanding this amendment, its motion to dismiss should be granted. The basis for this dismissal argument is the Defendants' contention that the sole factual basis alleged by the Government for its claim that, at the time of the September 2007 transfer of the Hawaii property to his daughter, Tara, for $10.00, Furnari "reasonably should have believed" believed he would incur a substantial [restitution] debt beyond his ability to pay was that

> [a]s of at least November 10, 2005, Furnari knew there was an investigation involving the sale of the Brady Lane property and the underlying loan transactions that comprised the offense conduct because he was interviewed about the sale and the transactions involving Scott Ashley by a Special Agent from the Office of the Inspector General. . . .

First Amended Complaint, ¶ 18.

Defendants argue that Furnari's interview by federal investigators was insufficient to cause Furnari to anticipate two years later (when the Hawaii property was transferred to his daughter, Tara) that he might incur a substantial debt from his conduct in the Brady Lane property transaction. In making this argument, however, the Defendants seek to limit the predicate conduct to the "snapshot" event of Furnari's interview on November

10, 2005.  However, neither the original Complaint nor the First Amended Complaint is so narrowly drawn.  Rather, both pleadings state that Furnari knew or should have known he was being investigated "as of at least" November 10, 2005 -- *not* that the November 10, 2005 interview was the *only* reason he should have known he was targeted for investigation.  Indeed, the records of Scott Ashley's and Furnari's criminal cases -- which the Court may consider in ruling on this Rule 12(b)(6) motion -- provide ample factual support for the Government's fraudulent conveyance claim under 28 U.S.C. § 3304(b)(1)(B) .

As indicated above, Furnari's involvement in the Brady Lane property transactions was chronicled Scott Ashley's November 2005 indictment.  Moreover, on the record at his May 16, 2007 sentencing hearing, Ashley expressly pointed out Furnari's involvement in deceiving the banks and urged the Government to continue to investigate Furnari on these matters.

Furthermore, Furnari testified in his deposition in this case that in 2006, he began experiencing financial difficulties, and, in fact, in 2006 -2007 he contemplated filing for bankruptcy and even hired lawyers specializing in bankruptcy to assist him.

Given that Ashley -- and the Court -- strongly suggested in May 2007 that the Government look should further into the Brady  Lane transaction and the involvement of others -- including Furnari -- and given that Ashley had been ordered to pay a substantial amount in restitution, in light of Furnari's admitted financial difficulties in 2006-2007,

14

there is sufficient factual predicate for the Government's allegation that at the time of the transfer of the Hawaii property to his daughter, Tara, for $10.00 in September 2007, Furnari reasonably should have believed he would incur a substantial restitution debt beyond his ability to pay.

For these reasons, Defendants' Motion to Dismiss Count I will be denied.

### 2. **SUMMARY JUDGMENT ON COUNT II WILL BE DENIED**

#### a. **Defendants' "No Creditor" Argument Lacks Legal Merit**

As indicated, Count II of the Complaint sets forth the Government's claim under 28 U.S.C. § 3304(b)(1)(A). Under this subsection, a transfer is fraudulent if the debtor makes the transfer "with actual intent to hinder, delay, or defraud a creditor." *Id.* Defendants move for summary judgment on Count II claiming that there were no "creditors" as defined under the FDCPA of the Hawaii property at the time of the September 7, 2007 conveyance. Defendants' theory is that the Government may only avoid the protection afforded entireties property under Hawaii state law if it can demonstrate that the Government itself was a "creditor" of Michael or Beverly Furnari at the time of the transfer; the Government cannot "step into the shoes" of the defrauded banks or any other creditor. Defendants again read the FDCPA too narrowly.

As an initial matter, case law demonstrates the lack of merit in Defendants' contention that the Government cannot "piggy back" onto the claims other creditors such as Huntington Bank, Wells Fargo, Independence Bank, Fifth Third Bank or Citizens

Bank. *See e.g., United States v. Gallion*, 504 F. App'x 373, 376 (6th Cir. 2012) (citing with approval *United States v. Witham*, 648 F.3d 40 (1st Cir. 2011). In *Witham* the First Circuit held that the Mandatory Victim Restitution Act of 1996 (the "MVRA"), Pub.L. No. 104–132, §§ 201–211, authorizes the United States to invoke FDCPA procedures to enforce *all* restitution orders, including those in favor of private-party victims. *See also United States v. Phillips,* 303 F.3d 548, 550 (5th Cir. 2002); *United States v. Kirtland*, 2012 WL 4463447 at * 12 (D. Kan. Sept. 27, 2012); *United States v. Cohan*, 2013 WL 6767873 at * 4 (E.D.N.Y. Dec. 23, 2013).

Defendants also appear to contend that because no restitution debt existed at the time of the transfer of the Hawaii property to Tara Furnari, the Government cannot show that the transfer was made "with actual intent to hinder, delay, or defraud a creditor," and therefore, cannot make out a claim under § 3304(b)(1)(A). Again, Defendants' contention finds no support in the case law as the courts have determined that "this provision by its plain language applies if a debtor intends to defraud *any* creditor," not just the Government or any private-party on whose behalf the Government pursues the fraudulent conveyance action. *See e.g., S.E.C. v. Haligiannis*, 608 F. Supp. 2d 444, 450 (S.D.N.Y. 2009).

The foregoing authorities establish that the Government may clearly rely on a "debt" (i.e., restitution) owed to private parties in asserting a fraudulent conveyance claim under the FDCPA. And, *United States v. Craft*, 535 U.S. 274, 288, 122 S.Ct. 414

16

(2002), makes clear that a restitution order against one spouse is enforceable against entireties property, notwithstanding the protection entireties property may be afforded under state law. *See United States v. Godwin*, 446 F. Supp. 2d 425 (E.D.N.C. 2006). Accordingly, Defendants' reliance on *Sawada v. Endo*, 57 Haw. 608, 561 P.2d 1291 (1977), is misplaced.

**b.     Defendants Have Not Established that They Are Entitled To Judgment As a Matter of Law on Count II.**

For purposes of determining "actual intent" to defraud under § 3304(b)(1)(A), the statute provides that consideration may be given to a number of factors. A non-exclusive list of factors are set forth in §3304(b)(2). These include consideration of whether:

(A)     the transfer or obligation was to an insider;

(B)     the debtor retained possession or control of the property transferred after the transfer;

(C)     the transfer or obligation was disclosed or concealed;

(D)     before the transfer was made or obligation incurred, the debtor had been sued or threatened with suit;

(E)     the transfer was of substantially all the debtor's assets;

(F)     the debtor absconded;

(G)     the debtor removed or concealed assets;

(H)     the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

  (I)  the debtor was insolvent or became insolvent[7] shortly after the transfer was made or the obligation was incurred;

  (J)  the transfer occurred shortly before or shortly after a substantial debt was incurred;

  (K)  the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

28 U.S.C. § 3304(b)(2).

"Although § 3304(b)(2) permits the Court to consider other factors, it does not require the Court to do so." *Sherrill*, 626 F. Supp. 2d at 1273 (citing *Fed. Trade Comm'n v. Nat'l Bus. Consultants, Inc.*, 376 F.3d 217, 321 n.7 (5th Cir. 2004)). Defendants have not even alleged, let alone establish, that the Government cannot demonstrate that application of the above factors to the facts of this case weigh in favor of a finding of actual intent to hinder, delay, or defraud. Indeed, not a single one of these factors is discussed. Therefore, Defendants' Motion for Summary Judgment on Count II will be denied.

## **CONCLUSION**

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that the Government's Motion to Amend Complaint **[Dkt. # 21]** is GRANTED.

---

[7] The statute provides that a debtor becomes insolvent when "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 28 U.S.C. §3302(a). There is a presumption of insolvency when a debtor generally does not pay his debts as they become due. 28 U.S.C. § 3302(b).

IT IS FURTHER ORDERED that Defendants' Motion and Corrected Motion to Dismiss Count I and for Summary Judgment on Count II of Plaintiff's Complaint **[Dkt. Nos. 19 and 20]** are DENIED.

        s/Gerald E. Rosen
        Chief Judge, United States District Court

Dated: January 10, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 10, 2014, by electronic and/or ordinary mail.

        s/Julie Owens
        Case Manager, (313) 234-5135